# Staunton

## LENWOOD BOARD v. CITY OF ROANOKE.

September 9, 1942.

Record No. 2606.

Present, Campbell, C. J., and Holt, Hudgins, Gregory and Eggleston, JJ.

The opinion states the case.

*Wilbur J. Austin, Jr.*, for the plaintiff in error.

*C. E. Cuddy* and *Richard F. Pence*, for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

A warrant was issued against Lenwood Board, charging that, on or about the 22nd of October, 1941, he was concerned in and possessed chances used in a lottery, and operated a lottery. He appealed from a judgment of conviction before the police justice to the Hustings Court, where he was again convicted, sentenced to jail for sixty days and fined $500.

When Board was arrested, he had in his possession $17 in one dollar bills, $6 in dimes, nickels and pennies, and a slip of paper 3 x 5 inches on which was written in pencil:

$$
\begin{array}{rcl}
\text{``4007} & & \\
6 - & 193 & - X \\
1 - & 399 & - 64 \\
10 - & 66 & - X \\
5 - & 183 & - X \\
4 - & 279 & - X \\
7 - & 126 & - X \\
m - & 572 & - X \\
12 - & 302 & - X \\
2 - & 552 & - 15 \\
3 - & 285 & - X \\
18 - & 1051 & \text{''}
\end{array}
$$

The only explanation the accused offered at the time of his arrest for the possession of these articles was that he had just returned from the county seat of Bedford where had paid his taxes, and that the treasurer had given him the pennies, nickels and dimes in change. He did not take the stand and offered no evidence in his own behalf.

Policeman A. J. Thomas testified that he had been making a study of the numbers racket in the city of Roanoke for the past three years. He had made numerous arrests and had examined the books of operators of this racket. The method of operating this lottery was that the owners or instigators would authorize certain persons, known as "pick-up men," to assign specific territories within the city to other men, known as numbers writers. The first duty of the numbers writer was to contact the victim or party desiring to participate in the gamble. On receipt of the money, the numbers writer would give the victim a slip of paper showing the number on which the victim had decided to gamble, the amount of money paid and the initials of the numbers writer. The "pick-up men" would make regular contact with the numbers writers, and obtain from each of them a list of the numbers sold and the amount of money received. Then a memorandum was made of the numbers sold and the amount of money received, and some mark or insignia was made to identify the numbers writer who had made the bet with the victim. These sums and the memoranda were delivered to the owners or operators of the lottery who usually were unknown to the numbers writers.

The police officer stated that the column of digits on the left, written on the slip and found on the accused, indicated the amounts of money the numbers writer had collected from the victims. The second series of figures indicated the numbers on which the victims had placed their bets. The letter "X" and the numbers "64" and "15" on the right were marks to indicate the identity of the numbers writers. For instance, in the first line of figures, "6" denotes six cents paid the numbers writer. The figures "193" denote the number selected by the victim on which to gamble, and "X" is the identifying mark of the numbers writer. The memoranda on the slip indicate that the accused had collected from three different numbers writers.

The officers had been watching the accused for six days immediately preceding his arrest. They watched him make regular and daily contacts with various parties who were known to the officers to be numbers writers.

The figures and letters on the ordinary piece of paper appear to be innocent in themselves. They convey no information to one who does not possess the key with which to unravel the rows of unintelligible figures. The testimony of the officers reveals the key which opens the door and brings to light the evil portents hidden within.

No witness testified that he saw the accused collect the money and slips from the numbers writers, nor did any witness testify that he saw the accused deliver money and slips to the owners of the numbers racket. However, such direct proof is not necessary under the ordinance, as it provides: "If any person· keep * * *, for the purpose of * * * (a) lottery * * * evidence of any chance or chances in any lottery, or any gaming device, apparatus or paraphernalia used in gaming, * * * or be concerned or interested, either as owner, operator or employee, in the keeping, exhibiting or operating of any such device, * * * he shall be confined in jail not less than one nor more than six months and fined not less than one hundred dollars nor more than five hundred dollars."

The apparently unintelligible figures become intelligible when decoded, and, as decoded, the slip with the figures is evidence of chances in a lottery. This evidence, connected with the actions of the accused in making regular contacts with persons known to be engaged in writing numbers, and his unconvincing explanation made to the officers of the possession of the $6 in dimes, nickels and pennies point to his guilt.

The record contains no denial of the fact that the figures on the slip of paper were evidence of chances in a lottery. This slip was kept or, rather, found in the possession of the accused. The testimony for the prosecution is positive. The officers' explanation of the use of the memoranda is clear. No reasonable hypothesis consistent with the innocence of the accused can be drawn from the evidence.

The only other assignment of error is to the action of the trial court in allowing police officer W. B. Carter "to testify as to his opinions and beliefs."

Carter stated that he knew the memoranda on the slip of paper, which he found on the accused when he arrested him, indicated "numbers played in the numbers racket." He stated that he based this testimony on his own experience from watching the operation of this type of lottery and from his knowledge of their method of bookkeeping. He said that in this particular lottery the method of keeping records had been changed and therefore he was not able to explain in full this particular bookkeeping record. A full explanation was made without objection by Officer Thomas.

It appeared from other evidence in the case that formerly the "pick-up men" kept their records in a memorandum book. Three copies were made of each number used in the lottery, one kept by the "pick-up men" in the book and one delivered to the numbers writers. The operators of the racket had changed their method of bookkeeping in order to escape detention. After stating, on direct examination and without objection, that the memorandum was a record of chances in a numbers lottery, Officer Carter was asked on cross examination:

"Q. * * *, explain to me what those figures mean.

"A. Mr. Austin, those are figures used by the pick-up man in the numbers racket to keep his records straight.

"Q. How do you know that?

"A. And they started using that new system just two days before. * * *.

"Q. You are unable to explain it?

"A. Not in detail, no sir.

"Q. And you are basing your opinion on information you get from someone else. Is that correct?

"A. * * * I am basing my opinion partly on my own knowledge and partly from information I received prior to his arrest."

It is true that this witness did, in several instances, express his opinions. When it appeared to the trial court that his answers were based on mere opinions disconnected from an explanation of the memoranda, the objections were sustained. The substance of the testimony of this witness on this phase

of the case is that the only interpretation of the memoranda on the slip of paper in question is that the slip is a record of a "pick-up man" engaged in the numbers racket. His statement that the first row of figures on the left is a record of the amount of money gambled, that the middle row of figures is a record of the numbers on which the gambles were made, etc., clarifies an unintelligible mass of figures. In one sense, this explanation was an opinion of the witness, but it is the opinion of an expert who has made a study of the somewhat complicated system of bookkeeping of various operators of this type of lottery. Without this officer's explanation of the memoranda, they would have been unintelligible to the jury.

Under these circumstances, we find no reversible error in the admission of the testimony, to which proper objections were made in the trial court.

The judgment of the trial court is

*Affirmed.*